**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LESTER A. LEACH,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 18-3075 (JEB)** |
| **JANET YELLEN, Secretary, United States Department of the Treasury,** | |
| **Defendant.** | |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Lester Leach is a Black employee of the United States Mint, a bureau of the Department of the Treasury, who has been the target of a series of workplace complaints. After one of his direct reports alleged that Leach had subjected him to a pattern of verbally abusive behavior, Plaintiff was investigated by the Office of the Inspector General and ultimately given a two-day suspension without pay; he was also passed over for a more senior Mint job. Seeking to turn the tables and claim that he is the one being victimized here, Leach then brought this suit against Treasury, alleging discrimination and retaliation under Title VII. Defendant now moves for summary judgment. As no jury could find that Plaintiff was treated improperly, the Court will grant the Motion.

**I.      Background**

    A.   <u>Factual Background</u>

        1.   *Prior-Conduct Issues*

Leach is a Black man who worked in the Protection Directorate of the Mint as Division Director for Security. <u>See</u> ECF No. 48 (Defendant's Statement of Undisputed Material Facts),

¶¶ 1–3; ECF No. 48-3 (Declaration of Dennis O'Connor), ¶ 3.   In that role, he was responsible for protecting the Mint's monetary and bullion assets and for ensuring that its workforce was appropriately vetted.  <u>See</u> SUMF, ¶ 3; O'Connor Decl., ¶ 3.  His position was considered one of particular sensitivity within the Mint.  <u>See</u> O'Connor Decl., ¶¶ 2–3.  Leach's immediate supervisor was Bill Bailey, who is also Black; and his second-level supervisor was Dennis O'Connor, who is white.  <u>See</u> SUMF, ¶ 4; ECF No. 48-4 (Declaration of Bill Bailey), ¶ 1; O'Connor Decl., ¶¶ 1, 3.

In the years prior to this case, Leach was the subject of numerous complaints from subordinates and others at the Mint.  <u>See</u> SUMF, ¶ 7; Bailey Decl., ¶ 3 ("Over the course of the years of my supervision of Mr. Leach I have personally observed, or other employees have reported directly to me, concerns regarding . . . insubordinate, confrontational, demeaning, condescending, berating, and verbally abusive behavior."); <u>id.</u>, ¶¶ 4–12; O'Connor Decl., ¶ 4 ("Over the years (dating as far back as when I started as Chief) I had learned of work related issues with Mr. Leach . . . .  I was aware of approximately six other incidents (and possibly more) where Mr. Leach's subordinates had made complaints about him.").  The first complaint came in 2007 or 2008, when a Mint employee requested and accepted a demotion in order to work outside Leach's supervision.  <u>See</u> SUMF, ¶ 8; Bailey Decl., ¶ 4.  Then in 2008, an employee filed an EEO complaint against Leach based on alleged mistreatment, which ultimately settled.  <u>See</u> SUMF, ¶ 9; Bailey Decl., ¶ 5.  In 2010, a supervisee alleged that Leach was "arrogant, berating, and unprofessional," Bailey Decl., ¶ 6, leading to a management inquiry and ultimately to informal counseling.  <u>See</u> SUMF, ¶¶ 10–13; Bailey Decl., ¶¶ 6–7.  With the list of Leach's "confrontational and insubordinate behavior" growing, Bailey in 2013 authored a two-page memorandum for Leach's file.  <u>See</u> Bailey Decl., Exh. 1 (Memorandum dated Feb. 13,

2013).  That document surveyed examples of Leach's unacceptable behavior and warned that "if [Leach's] behavior does not improve[,] [Bailey] will take the appropriate actions going forward" because Bailey was "spending a large amount of time dealing with" Leach-related headaches. Id.

But the hits kept coming.  In 2014, Bailey issued Plaintiff an oral counseling after a Department of Treasury investigation concluded that Leach had discriminated against one of his subordinates.  See SUMF, ¶ 15; Bailey Decl., ¶ 10; ECF No. 49-1 (Leach Deposition) at 51–56. The next year, another of Leach's supervisees asked that Bailey mediate a communication issue between him and Leach.  See SUMF, ¶ 16; Bailey Decl., ¶ 11.  In 2016, an IT employee complained about a "verbal altercation" with Leach that left her unwilling to continue a project with him.  See SUMF, ¶ 17; Bailey Decl., ¶ 12.  Finally, before sending the email that precipitated this case, Arnaldo Medina complained verbally to Bailey about Leach's "abusive conduct."  Bailey Decl., ¶ 14; SUMF, ¶ 19; ECF No. 71-2 (Bailey Deposition) at 29–31; ECF No. 48-10 (Medina Deposition) at 83–84.

Leach disputes the merits of these underlying complaints.  He contends that other employees were themselves to blame, misinterpreted his remarks, sought voluntary reassignments, and the like.  See ECF No. 60-2 (Plaintiff's Response to Def. SUMF), ¶¶ 7–19. Plaintiff also identifies positive performance reviews he received during the time, id., ¶ 14, and suggests that those reviews mean that his supervisors did not believe the complaints against him. Id., ¶ 10.  But Leach does not dispute the existence of these complaints (regardless of their merits), nor that notwithstanding any performance reviews, Bailey at various points required that Leach take remedial personnel training, placed a memorandum in his file, and issued him oral

counseling.  See Pl. SUMF Resp., ¶¶ 12 (training), 14 (memorandum), 15 (oral counseling); see also ECF No. 71-1 (Def. Resp. to Pl. SUMF) at 21.

One other point of background bears mention.  In August 2016, Leach filed an unrelated EEO complaint alleging that other Mint officials, including Acting Deputy Director David Motl, had denied him funding to attend a training because of his race.  See ECF No. 48-2 (Declaration of Ralph Conte), Exh. 5.  Both of Leach's managers here (Bailey and O'Connor) supported funding that training, and Leach's EEO complaint did not name them.  See SUMF, ¶¶ 28–30.  That complaint is relevant only to the extent that Leach contends that Motl still harbored retaliatory animus against him for it.

### 2.  *Allegation and Investigation*

On December 21, 2016, against that checkered history, Leach's subordinate Arnaldo Medina sent an email to Bailey and O'Connor describing "abuse behavior" by Leach.  See Bailey Decl., Exh. 3 (Medina Email); SUMF, ¶ 5.  In that email, Medina complained of "constant condescending and verbally abusive" treatment from Leach over a period spanning a year and a half, alleging that he has "never felt so degraded in [his] life."  Medina Email; see SUMF, ¶ 6.  Medina asked that Bailey and O'Connor remove him from Plaintiff's supervision and give him 60–90 days to find employment elsewhere.  See Medina Email; SUMF, ¶ 6.  (Leach recognizes that Medina sent that email to his supervisors but argues that the allegations it contained "are baseless and untrue."  Pl. SUMF Response, ¶ 6.)

That email understandably set off alarm bells with Leach's supervisors.  Shortly after receiving it, Bailey recommended to O'Connor that the Mint conduct an administrative investigation into the email's allegations.  O'Connor agreed.  See SUMF, ¶¶ 23–24; Bailey Decl., ¶ 15; O'Connor Decl., ¶ 5.  On January 9, 2017, Bailey informed Plaintiff that the Mint

would be investigating his conduct and removing him from supervisory responsibilities pending the outcome of that investigation. See SUMF, ¶¶ 25–26; Bailey Decl., ¶ 16.

Over the subsequent week, O'Connor began to consider whether a more formal investigation by Treasury's Office of the Inspector General would be appropriate. See O'Connor Decl., ¶ 8; SUMF, ¶ 31. An OIG investigation is very similar to an administrative investigation; the main differences are that OIG uses law-enforcement officers to conduct investigations, interviews witnesses under oath, and may refer conduct to the relevant U.S. Attorney's office. See O'Connor Decl., ¶ 6. O'Connor ultimately concluded that an OIG investigation was warranted. He did so based on "the seriousness of the allegations, Mr. Leach's senior level, supervisory, and sensitive position within the Protection Directorate, as well as [O'Connor's] general knowledge of the past complaints against Mr. Leach." O'Connor Decl., ¶ 8; SUMF, ¶ 31. On January 17, 2017, O'Connor thus referred the Medina email to OIG. See ECF No. 48-5 (Declaration of Anthony Scott), Exh. 1 (Referral Letter); O'Connor Decl., ¶ 9; SUMF, ¶ 32. OIG reviewed the referral and decided to accept the matter for investigation, sharing its decision with O'Connor on January 24, 2017. See O'Connor Decl., Exh. 2 (OIG Investigation Letter); ¶¶ 11–12; SUMF, ¶¶ 35–36.

Two relevant events occurred between when Bailey notified Leach that he would be investigated (January 9) and when O'Connor referred the matter to OIG (January 17). First, on January 11, Leach contacted an EEO counselor and alleged that the Mint's administrative investigation and interim removal of his supervisory duties were discriminatory and retaliatory. See SUMF, ¶ 27; Conte Decl., Exh. 4. In their sworn affidavits, O'Connor and Bailey both testify that they did not know about that EEO complaint at the time that O'Connor referred the matter to OIG. See SUMF, ¶ 33; O'Connor Decl., ¶ 10; Bailey Decl., ¶ 18. Second, O'Connor

briefed both Acting Deputy Director Motl and Chief Counsel Jean Gentry, informing the two

that the agency planned to investigate Medina's allegations.  See O'Connor Decl., ¶ 8.

As before, Leach does not directly contest the veracity of these specific facts.  He instead

takes a tangential approach, arguing that O'Connor did not independently verify the allegations

before referring the matter to OIG, that O'Connor did not send prior positive performance

reviews to OIG, and that OIG's decision to investigate was based only on "false and pretextual

allegations."  Pl. SUMF Resp., ¶¶ 35–36; see generally id., ¶¶ 31–37.  The Court discusses these

arguments later.  For present purposes, it notes only that Leach cites no record evidence to

dispute the basic outline of the facts set forth above.

### 3.  *Suspension, Telework, and Detail*

OIG accepted the matter for investigation on January 24, 2017, and issued its final report

on November 17, 2017.  See SUMF, ¶¶ 37, 39; Conte Decl., Exh. 6 (OIG Report).  As a part of

its investigation, OIG interviewed eight Mint employees, including Leach.  See OIG Report at 2.

It also offered Plaintiff the opportunity to submit any documents that he viewed as relevant,

which he did.  Id. (noting OIG reviewed "[r]ebuttal documents provided to TOIG by Lester

Leach"); SUMF, ¶ 37.

During his recorded and transcribed OIG interview, Leach made several statements that

suggested that others could view him as intimidating:

> ▪ Quite often, I'm the only one in the room who really knows what
> I'm talking about, because I have put time in a lot of things that other
> people haven't.  So, I think part of that issue is some people may
> feel intimidated, but do I go on lording over people?  No, I don't
> have to, but I can't help if other people feel intimidated because I
> try to be accomplished, and I'm always trying to gain new skills.

> ▪ . . . I can't help the fact that other people don't put as much effort
> into developing their craft as I do, and their response to that quite
> often is going to be, "Well, he thinks he knows more than

> everybody." In a lot of cases, I do. I'm sorry. In a lot of cases, I'm going to be the only one in the room that knows what I'm talking about.
>
> ▪ [My wife] says, "Lester, you can't help it, but you do know more than other people, and you got to try to tone it down." I try, but I can't help the fact that other people are going to get intimidated by it, and that was [my wife's] assessment . . . My knowledge and expertise to some people are intimidating.

Conte Decl., Exh. 7 (Leach Interview Transcript); SUMF, ¶ 38.

OIG issued its final, 12-page (plus appendices) report on November 17. The investigation found "substantiated" the allegation that Leach had "subjected a subordinate employee to condescending and verbally abusive behavior over several months." OIG Report at 10; SUMF, ¶ 39; Conte Decl., Exh. 8 (OIG Conclusion Letter). It noted that "multiple" current and former Mint employees "corroborated Leach's inappropriate behavior." OIG Report at 10. And it listed several regulations and policies that it suggested were relevant to Plaintiff's conduct. Id.

Based on the report's findings, Bailey issued Leach a Notice of Proposed Suspension on January 31, 2018. See SUMF, ¶ 40; Bailey Decl., ¶ 19; Bailey Decl., Exh. 5 (Notice of Proposed Suspension). That five-page Notice concluded that Leach had conducted himself in a manner unbecoming a federal-government manager. See Notice of Proposed Suspension at 1–2. It also found that Leach had failed to follow instructions, failed to respond to a supervisor's request, and failed to timely pay an overdue balance on a government-issued travel credit card. Id. The Notice accordingly proposed to suspend him without pay for five days, and it noted that under the Mint's telework policies any disciplinary action would also end Leach's ability to telework. See SUMF, ¶¶ 41–42; Notice of Proposed Suspension at 1, 5.

On April 11, 2018, O'Connor issued a nine-page Notice of Suspension Decision.  See O'Connor Decl., Exh. 3 (Suspension Decision).  That memorandum "carefully reviewed and considered" Leach's responses to Bailey's Notice of Proposed Suspension, but ultimately sustained the charges.  See Suspension Decision at 1, 2–5; SUMF, ¶ 42; O'Connor Decl., ¶ 16.  O'Connor concluded that the consistent statements of five employees under Leach's supervision, the similarity of those reports with prior incidents in Leach's file, and the corroborative effect of Leach's tone with the investigator all led him to "agree with the TOIG's finding that [Leach] subjected Arnaldo Medina to condescending and verbally abusive behavior."  Suspension Decision at 2.  O'Connor also sustained the charges of failure to follow instructions, failure to respond to a supervisor's request, and failure to timely pay his federal card balance.  Id. at 3–6.  Balancing "great concern" about these violations with a recognition that Leach is "very capable" regarding security issues and had received positive performance reviews in the past, O'Connor determined that his conduct warranted a two-day suspension without pay — down from the proposed five-day suspension without pay.  Id. at 7–8.  As a result of that misconduct finding, Leach's participation in the Mint's telework program was also terminated.  See SUMF, ¶ 42; O'Connor Decl., ¶ 16.

Also based on the OIG report, Bailey determined that Leach "could no longer be trusted with supervisory authority" because of the serious morale problems his behavior had caused.  See Bailey Decl., ¶ 21; SUMF, ¶ 43.  Bailey accordingly coordinated with the Mint's Information Technology Directorate (ITD) to detail Leach to that office.  See SUMF, ¶ 44; Bailey Decl., ¶ 22.  Leach served on that detail from February 2018 through March 2019, and he then was permanently reassigned to a nonsupervisory position back in the Protection Directorate.  See SUMF, ¶¶ 44–46; Bailey Decl., ¶ 23.

Here, too, Leach does not identify record evidence that disputes the basic facts.  He rejects Defendant's conclusions because in his view the OIG report was based on "pretextual information," Pl. SUMF Resp., ¶ 40, its conclusions were "engineered," id., ¶¶ 41, 43, and the underlying allegations were "untrue."  Id., ¶¶ 42, 43.  The Court considers these arguments below, but notes here only that they do not call into question the underlying narrative facts.

### 4.  *Non-Selection*

One final coda.  In May 2017, with the OIG investigation ongoing, the division in which Leach worked received approval from agency leadership to create a new Assistant Deputy Chief of Police position.  See SUMF, ¶ 47; O'Connor Decl., ¶ 17; id., Exh. 4 (ADC Approval).  That position was senior to Leach's former role.  See SUMF, ¶ 47.  The Mint posted a vacancy announcement on August 1 of that year, and Leach applied for the job.  See SUMF, ¶¶ 48–49.  A three-member selection panel interviewed him and two other candidates.  Id., ¶¶ 49–51.  Plaintiff does not contend that any of the interview panelists harbored discriminatory or retaliatory animus towards him.  Id.

During Leach's interview, one panelist observed that "Leach did not answer or insufficiently answered several questions."  ECF No. 48-7 (EEO Declaration of DeAnna Wynn) at 5; SUMF, ¶ 50.  Plaintiff also "seemed to suggest that the position for which he was interviewing is a position that he currently occupies" and "asked if the interview panel had seen the vacancy announcement or job description."  Wynn Decl. at 6.  Perhaps unsurprisingly, Leach received the lowest score of the three applicants, and the panel did not refer him to Bailey, the selecting official, for further consideration.  Id. at 8 (comparing Leach's score of 41 to other interviewees' scores of 69 and 74); SUMF, ¶ 52.  Bailey ultimately selected Bobby McCoy for

the position.  <u>See</u> SUMF, ¶¶ 53–54; Bailey Decl., ¶ 26.  McCoy was a twenty-year veteran and an experienced Mint official, and he is also Black.  <u>See</u> SUMF, ¶¶ 53–54; Bailey Decl., ¶ 26.

Leach asserts that the position was created as pretext to cut him out from department leadership.  <u>See</u> Pl. SUMF Resp., ¶ 47.  The Court considers that argument below.  For present purposes, however, it notes that the record reflects these basic facts around the new position and Leach's non-selection for it.

### B.  Procedural History

Plaintiff filed this lawsuit on December 21, 2018.  <u>See</u> ECF No. 1 (Compl.).  He contends that the many agency actions described above were each discriminatory and retaliatory in violation of Title VII.  <u>Id.</u>, ¶¶ 66–74 (Count I), 80–84 (Count III).  He also argues that those actions created a hostile work environment.  <u>Id.</u>, ¶¶ 75–79 (Count II), 85–88 (Count IV).  Treasury now moves for summary judgment on all of Leach's counts.

## II.   Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247–48 (1986); <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 248; <u>Holcomb</u>, 433 F.3d at 895.  A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Liberty Lobby</u>, 477 U.S. at 248; <u>see also</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Holcomb</u>, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). The Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in his favor. See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III. Analysis

Title VII protects federal employees from discrimination because of race and from retaliation for reporting discrimination. See 42 U.S.C. § 2000e-16(a) (discrimination); id. § 2000e-3(a) (retaliation). Although the precise standards differ, an employee seeking to make out either a discrimination or retaliation claim must establish two elements: (1) he suffered an adverse action, (2) either because of a protected characteristic or in retaliation for reporting discrimination. Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (discrimination); id. at 1198 (retaliation). Leach raises both discrimination and retaliation challenges (Counts I and III), and he also contends that he was subjected to a discriminatory and retaliatory hostile work environment (Counts II and IV).

The Court's analysis proceeds in three parts.  First, it determines which of the smorgasbord of agency activities Leach identifies qualify as an adverse action within the meaning of Title VII's discrimination and retaliation provisions.  Second, with respect to qualifying adverse actions, the Court considers whether Leach has produced any evidence that would allow a reasonable jury to find those actions discriminatory or retaliatory.  Finally, the Court takes up his hostile-work-environment contentions.

### A. Adverse Employment Actions

Plaintiff identifies a large assortment of putative adverse actions on which he seeks to base his claims.  See Compl., ¶¶ 82(a)–(h) (discrimination), 72(a)–(h) (retaliation).  They are: (1) the initial administrative investigation into Leach, id., ¶¶ 72(a), 82(a); (2) the removal of his supervisory duties during the investigation, id., ¶¶ 72(b), 82(b); (3) the referral of the matter to OIG for its consideration, id., ¶¶ 72(a), 82(a); (4) O'Connor and Bailey's conduct during that OIG investigation, id., ¶¶ 72(a), 82(a); (5) the Notice of Proposed Suspension, which recommended a 5-day suspension without pay, id., ¶¶ 72(f), 82(f); (6) the Suspension Decision, which suspended Leach for two days without pay and revoked his ability to telework, id., ¶¶ 72(f)–(h), 82(f)–(h); (7) the decision to detail him to a nonsupervisory role in the Information Technology Directorate, id., ¶¶ 72(g), 82(g); (8) the creation of a new Assistant Deputy Chief position, id., ¶¶ 72(c), 82(c); and (9) Leach's non-selection for that position.  Id., ¶¶ 72(e), 82(e).  The Court considers first which of these actions may form the basis for a discrimination claim and then (because the standards differ) which may underlie a retaliation claim.

### 1. *Discrimination*

Last year, in Chambers v. District of Columbia, 35 F.4th 870 (D.C. Cir. 2022), the *en banc* D.C. Circuit held that Title VII's adverse-action requirement obligates a plaintiff to show

only that he was discriminated against with respect to his "terms, conditions, or privileges of employment." Id. at 874–75 (quoting 42 U.S.C. § 2000e–2(a)(1)). Chambers thus overruled Brown v. Brody, 199 F.3d 446 (D.C. Cir. 1999), which had required that the challenged adverse action also carry "objectively tangible harm." Brown, 199 F.3d at 457. Under the "objectively tangible harm" test, a plaintiff who "suffers no diminution in pay or benefits does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities." Id. Brown had accordingly held that denial of a job transfer was not actionable discrimination.

In Chambers, the Circuit did away with that objectively-tangible-harm requirement for discrimination claims. See 35 F.4th at 874–75. It held that an employer does discriminate in violation of Title VII when it denies a job transfer because of a protected characteristic. Id. In so holding, Chambers broadened the range of actions that can form the basis for a discrimination claim.

Here, Plaintiff argues that all nine of the actions listed above qualify as adverse for Title VII discrimination purposes. Many of them — including Leach's removal of duties, suspension, transfer, and non-selection — clearly do. Id. Others are much closer. In particular, it is not self-evident (even post-Chambers) that the OIG referral and proposed suspension themselves altered Leach's "terms, conditions, or privileges of employment." Id. at 874 (noting that "not everything that happens at the workplace affects an employee's 'terms, conditions, or privileges of employment'"); see also Bain v. Off. of Att'y Gen., No. 21-1751, 2022 WL 17904236, at *23 (D.D.C. 2022) (describing interpretation of that phrase as a "novel and important question . . . in a post-Chambers world"). But because the Court holds below that Plaintiff fails to identify any evidence that any of these actions were taken because of his race, it believes that the most

prudent course is to assume without deciding that all of these actions qualify as adverse actions for discrimination purposes under Chambers.

2.   *Retaliation*

Title VII's retaliation standard, however, is a different story.  That is because the Circuit in Chambers limited its holding to discrimination claims and left the existing "materially adverse action" standard in place for retaliation claims.  See 35 F.4th at 876 (explaining this result as justified by "fundamental differences between the antidiscrimination and antiretaliation provisions").  "To prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim."  Baloch, 550 F.3d at 1198.  A "materially adverse action" is one that, objectively speaking, would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 1198, 1199 n.5 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006)).  It "[t]ypically . . . involves 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'"  Bridgeforth v. Jewell, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).  It conversely does not reach every "[m]inor . . . employment action[] that an irritable, chip-on-the-shoulder employee did not like."  Id. (quoting Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001)).  While the retaliation standard historically "encompass[ed] a broader sweep of actions" than the discrimination standard did, see Baloch, 550 F.3d at 1198 n.4, the opposite is thus true after Chambers.

Two types of employment actions bear particular mention in this case.  First, the D.C. Circuit has made clear that proposed suspensions, as opposed to actual suspensions themselves,

are not materially adverse for retaliation purposes.  See Baloch, 550 F.3d at 1199 (holding that

"proposed 2-day and 30-day suspensions" were not materially adverse actions (emphasis

omitted)).  Second, courts in our district have held that referrals to inspectors general are

typically not actionable.  In Moore v. United States Department of State, 351 F. Supp. 3d 76

(D.D.C. 2019), for example, Judge Dabney Friedrich held that a State Department employee

could not rest a Title VII retaliation claim on another employee's recommendation that the

Office of Inspector General investigate the plaintiff, concluding that "the request for an

investigation by an independent body (as opposed to the disciplinary action that may follow)

does not constitute an actionable adverse employment action . . . ."  Id. at 95 (quoting Ware v.

Billington, 344 F. Supp. 2d 63, 76 (D.D.C. 2004)).  Ware v. Billington, the case on which Moore

relied, held just the same: that "although the discipline imposed as a result of an investigation

may have a sufficiently adverse effect on plaintiff's employment to be actionable, the mere

initiation of the investigation does not."  344 F. Supp. 2d at 76.

    The only exception comes where initiation of that OIG investigation itself triggers other

legal consequences.  For example, in King v. Holder, 77 F. Supp. 3d 146 (D.D.C. 2015), Judge

Colleen Kollar-Kotelly held that an OIG investigation could qualify as an adverse employment

action where the plaintiff alleged that initiation of that investigation delayed an otherwise

automatic promotion.  Id. at 151–52; see also Moore, 351 F. Supp. 3d at 95 (noting plaintiff

"does not allege any disciplinary or other employment action resulting from the investigation").

Unless a plaintiff alleges that an OIG investigation itself works materially adverse consequences,

then, the mere initiation of (or request for) one cannot qualify as a basis for a Title VII retaliation

claim.

Here, many of Leach's alleged actions do count as materially adverse for purposes of retaliation.  It is clear, however, for the reasons just explained, that neither his proposed suspension nor his referral to OIG counts.  No consequences flowed from the investigation itself: Bailey removed Leach from his supervisory duties on January 9, prior to O'Connor's referring the matter to OIG on January 17.  See SUMF, ¶¶ 25–26, 35–36.  And Plaintiff's subsequent suspension resulted from different, later actions — namely, the Notice of Proposed Suspension and the Suspension Decision.  Id., ¶¶ 41–42.  Leach thus identifies no basis on which the Court can view the OIG referral as a materially adverse action capable of sustaining a retaliation claim. See also Ware, 344 F. Supp. 2d at 76 ("[A]lthough the discipline imposed as a result of an investigation may have a sufficiently adverse effect on plaintiff's employment to be actionable, the mere initiation of the investigation does not.").

*   *   *

The Court now considers whether Plaintiff has raised a jury question of discrimination based on any of the nine actions and of retaliation based on all but his referral to OIG and his proposed suspension.

B.  Discrete Discriminatory or Retaliatory Acts

The Supreme Court established the three-part burden-shifting framework that governs traditional claims of employment discrimination and retaliation in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation.  When he "meets this burden, '[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason' for its action.  If the employer succeeds, then the plaintiff must 'be afforded a fair opportunity to show that [the employer's] stated reason . . .  was in fact pretext' for unlawful

16

discrimination." Chappell-Johnson v. Powell, 440 F.3d 484, 487 (D.C. Cir. 2006) (quoting

McDonnell Douglas, 411 U.S. at 802, 804) (internal citations omitted).

When, however, "an employee has suffered an adverse employment action and an

employer has asserted a legitimate, non-discriminatory reason for the decision, the district court

need not — and should not — decide whether the plaintiff actually made out a *prima facie* case

under McDonnell Douglas." Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir.

2008) (emphasis omitted). The court's task in such cases is to "resolve one central question: Has

the employee produced sufficient evidence for a reasonable jury to find that the employer's

asserted non-discriminatory reason was not the actual reason and that the employer intentionally

discriminated against the employee on the basis of race, color, religion, sex, or national origin?"

Id. The "relevant inquiry" is thus whether an employee has "produced sufficient evidence for a

reasonable jury to conclude that the [defendant's] asserted nondiscriminatory reason for firing

h[im] was not the actual reason, and that instead the [defendant] was intentionally discriminating

. . . ." Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016). This

analysis "appl[ies] equally to retaliation claims." Jones v. Bernanke, 557 F.3d 670, 678 (D.C.

Cir. 2009).

The Court considers the nine alleged actions in turn, grouping them where appropriate.

1. *Administrative Investigation and Interim Removal of Duties*

Leach first contends that the decisions to launch an administrative investigation and to

temporarily remove his duties during its pendency were discriminatory and retaliatory. This

argument does not get off the ground because the Mint has offered non-discriminatory reasons

for the decisions and Leach has produced no evidence that would allow a reasonable jury to find

those reasons pretextual.

Begin with Bailey and O'Connor's legitimate reasons to investigate Medina's email and suspend Leach's supervisory duties in the interim. That email alleged "constant condescending and verbally abusive behavior" over a period of eighteen months. See Medina Email. That is an objectively troubling email for any manager to receive. All the more so because Medina had complained before about Leach's treatment and because many employees had previously raised similar concerns about Plaintiff. See SUMF, ¶¶ 7–19. The referring officials thus had a legitimate basis for believing that the matter warranted an administrative investigation. See Brady, 520 F.3d at 496. Similarly, Bailey offered legitimate reasons for removing Leach's supervisory duties during the investigation's pendency. As Bailey described, given the "serious nature of the allegations," it made sense to temporarily bar Leach from directly managing others while the investigation proceeded. See Bailey Decl., ¶¶ 15–16; SUMF, ¶¶ 25–26. That reasoning is facially legitimate.

Leach identifies no record evidence to suggest that these reasons were pretext for discrimination or retaliation. Beginning with discrimination, Leach has shown nothing that indicates racial animus played any role in the decision to investigate him. See ECF No. 71 (Reply) at 1 (highlighting that Leach's Opposition "focuses principally on his retaliation claims" because "Leach fails to identify any record evidence, or even to make any coherent allegation, of race discrimination by Deputy Chief Bill Bailey (who is the same race as Leach), Chief Dennis O'Connor or any of the other management officials that he identifies"). And regarding retaliation, Leach had not filed his January 11 EEO complaint at the time that Bailey and O'Connor decided to investigate him and suspend his duties, a decision they communicated to him on January 9. See SUMF, ¶¶ 25–26; Bailey Decl., ¶ 16. The only possible basis for retaliation would be Leach's 2016 EEO complaint, which named neither Bailey nor O'Connor

and which concerned a matter on which those two superiors actually took <u>his</u> side.  <u>See</u> SUMF, ¶ 30.  Leach also does not argue that either Motl or Gentry influenced this initial action on January 9, 2017, nor is there any evidence to that effect.

His central position regarding these actions is that Bailey "admitted in his deposition that he did not believe the allegations in Medina's email."  Pl. SUMF Resp., ¶¶ 20, 23, 24.  This, however, relies on a flagrant mischaracterization of Bailey's deposition testimony.  There, Bailey testified only that he believed the allegations in Medina's email were serious, but that he had not prejudged them or formed an opinion on their veracity before the investigation.  <u>See</u> Bailey Depo. at 123–24; <u>id.</u> at 115–17.  Bailey elsewhere specifically emphasized that he felt the allegations were serious.  <u>Id.</u> at 72–74.  Distorting one snippet of deposition testimony does not create a genuine fact dispute.

Summary judgment is thus warranted on the proposed initial administrative investigation and the interim removal of Leach's managerial duties.

### 2.  *OIG Referral*

Leach next argues that O'Connor's January 17, 2017, decision to refer him to OIG was discriminatory and retaliatory.  <u>See</u> Referral Letter; O'Connor Decl., ¶ 9; SUMF, ¶ 32.  Because the Court held above that the OIG referral was not a materially adverse action for retaliation purposes, it will consider only whether it was discriminatory.

The same facially legitimate reasons that justified the initial administrative investigation also justified referring the matter to OIG.  Again, the email's allegations were serious and troubling, and it was well within reason for O'Connor to recommend an independent investigation.  O'Connor's declaration explains that he based his referral decision on "the seriousness of the allegations, Mr. Leach's senior level, supervisory, and sensitive position

within the Protection Directorate, as well as [O'Connor's] general knowledge of the past complaints against Mr. Leach."  O'Connor Decl., ¶ 8; see also SUMF, ¶ 31.  That explanation is plainly legitimate.

In response, Plaintiff does not identify a material dispute regarding whether that explanation was a pretext for race discrimination.  His entire argument is that "O'Connor made [the referral] because of the Plaintiff's prior EEO complaint," not because of his race.  See Pl. SUMF Resp., ¶ 31.  Leach contends in particular that Motl and Gentry wanted to retaliate against him because of his prior EEO activity, and that those two officials influenced O'Connor's referral to the Inspector General.  Id.  As explained above, however, retaliation is out.  Leach thus must produce sufficient evidence for a reasonable jury to conclude that discrimination was the actual reason for his firing.  See, e.g., Wheeler, 812 F.3d at 1114.  Because he cannot do so, summary judgment is warranted here as well.

Leach adds that Bailey and O'Connor's conduct during the OIG investigation constituted a separate adverse action because they "only gave the investigator negative materials about the Plaintiff, withholding the incredibly positive record of outstanding performance appraisals the Plaintiff had achieved in the last decade."  Pl. SUMF Resp., ¶ 34.  This factual proposition finds no support in the record.  Bailey responded to questions from the investigator, who sought to learn more about the allegations against Leach — not to generally assess his performance in the position.  See generally Bailey Depo.; O'Connor Depo.; Reply at 14–15.  Indeed, O'Connor specifically considered Leach's performance history alongside the OIG report in imposing discipline.  See Suspension Decision at 7.  Leach has thus not provided evidence in support of this claim, much less some that would suggest that any misstatements would have been because of discrimination or retaliation.

3.  *Suspension and Telework*

Leach fares no better on his argument that the proposed five-day suspension was discriminatory, or that the ultimate two-day suspension (which also revoked his ability to telework) was discriminatory or retaliatory. As before, the Mint offered legitimate reasons for all of these actions. Bailey's five-page Notice of Proposed Suspension analyzed the OIG report and offered reasoned conclusions for recommending a suspension. See generally Notice of Proposed Suspension. O'Connor's nine-page Notice of Suspension Decision in turn "carefully reviewed and considered" Bailey's Notice, as well as Leach's responses to that proposal. See Suspension Decision at 2. It walked charge by charge through OIG's findings, the evidence supporting them, and Leach's responses to each. See generally Suspension Decision; see also SUMF, ¶ 42; O'Connor Decl., ¶ 16. It also specifically considered Leach's prior performance ratings alongside other exacerbating and mitigating factors. See Suspension Decision at 7. O'Connor's memorandum ultimately "agree[d] with the TOIG's finding that [Leach] subjected Arnaldo Medina to condescending and verbally abusive behavior," but decided a two-day suspension was sufficient. Id. at 2, 7–8. And, as the memorandum explained, under the Mint's general telework policy, this misconduct finding automatically revoked Leach's teleworking privileges. Id. at 9. Those decisions were supported by facially legitimate reasoning.

Leach has adduced no evidence that these actions were motivated by discriminatory or retaliatory intent. He asserts only that "the findings of the OIG report were engineered by Bailey with information that Bailey knew were [*sic*] not true" because "Bailey withheld anything positive about the Plaintiff for example his decade long record of outstanding appraisals and achievements." Pl. SUMF Resp., ¶¶ 40–43. As discussed above, however, Leach identifies no evidence that Bailey knowingly provided false information to OIG or "withheld" anything

21

relevant from the investigation.  And even though Plaintiff's past performance reviews were not central to the issues at hand, O'Connor's decision still specifically considered them in its analysis.  See Suspension Decision at 7.  Leach also cannot claim that Motl or Gentry infected the final investigative report or any decisions that resulted from it, as they "w[ere] in no way involved in the investigation of [his] alleged misconduct."  Hampton v. Vilsack, 685 F.3d 1096, 1101 (D.C. Cir. 2012).  In any event, both Bailey and O'Connor conducted their own "independent review[s] of the evidence" before issuing their respective Notice of Proposed Removal and final removal decision.  Id.  Leach thus has shown no material dispute on this point either.

### 4.  *ITD Detail and Reassignment*

Next is Leach's challenge to his ITD detail and his subsequent reassignment to a non-supervisory role.  The Mint offered sound justifications for these decisions as well.  Based on the OIG report's findings, Bailey reasonably determined that Leach "could no longer be trusted with supervisory authority."  Bailey Decl., ¶ 21.  He thus worked with ITD staff to arrange for Plaintiff to be detailed there.  Following that detail, Leach was then transferred back to the Protection Directorate in a non-supervisory role.  See SUMF, ¶¶ 43–46.  Again, in light of the serious allegations against him and his supervisors' well-explained suspension decision, this all was facially legitimate.  See also Def. Resp. to Pl. SUMF, ¶ 14 (explaining how "the detail was appropriate in light of the Inspector General findings and further was meant to utilize Plaintiff's extensive training in that [information technology] field").

Leach counters that Bailey "did not put the Plaintiff back in his position because he was never planning to," that the OIG investigation "was a pretext for the discrimination the Plaintiff faced because of his protected EEO activity," and that his supervisors skewed the OIG report in

the ways discussed above.  See Pl. SUMF Resp., ¶ 43.  These conclusory allegations find no support in the record and do not create a material dispute of fact sufficient to survive summary judgment.

### 5.  *Assistant Police Chief Creation and Non-Selection*

Last up are Leach's contentions regarding the creation of an Assistant Police Chief role and his non-selection for that role, arguments that meet the same fate as the rest.  To begin, O'Connor reasonably explained why he wanted to create the role, see ADC Approval at 1; see also O'Connor Decl., ¶ 17, and the Department authorized it in a six-page memorandum that documented why the position was "essential to strengthen the necessary oversight of the [Mint's] law enforcement and security functions."  ADC Approval at 2; see generally id. at 1–6.  The agency also has a sound explanation for its decision not to hire Leach: the three-member interview panel, with which Leach has no objection, gave him the lowest score based on their perception that his answers were incomplete and that he refused to answer some questions.  See Wynn Decl. at 5–6; SUMF, ¶ 50.

Plaintiff offers no evidence that these agency actions were discriminatory or retaliatory. His only argument regarding the position's creation is that "Chief O'Connor and Deputy Chief Bailey worked with higher up officials to create the position and hire who they wanted for it." Pl. SUMF Resp., ¶¶ 49, 50, 52, 53.  But Leach provides no evidence to allow for any inference that either O'Connor or Bailey had a discriminatory or retaliatory motive when they sought and received departmental approval for that position.  Regarding his non-selection, Plaintiff does not challenge the panel's decision to award him the lowest score; he offers only the conclusory assertion that answering the panel's questions would have been "futile."  Id., ¶ 52.  With the agency's facially legitimate explanation undisturbed by any contrary facts, the Court sees no way

a jury could find the agency discriminated against Leach in not hiring him to this position.  Cf. Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Short of finding that the employer's stated reason was indeed a pretext, however — and here one must beware of using 20/20 hindsight — the court must respect the employer's unfettered discretion to choose among qualified candidates.").

Leach, consequently, has identified no evidence that could support a jury verdict of retaliation or discrimination, and so the Court will grant Defendant's Motion with respect to those counts.

C.  Hostile Work Environment

The Court concludes with Leach's final claim under Title VII, in which he alleges that the same acts described above also created a hostile work environment.  "The bar for demonstrating a hostile work environment is a high one: A plaintiff must show that his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Achagzai v. Broad. Bd. of Governors, 170 F. Supp. 3d 164, 183 (D.D.C. 2016) (citation omitted and formatting modified); see also Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 577 (D.C. Cir. 2013).  In evaluating a hostile-environment claim, the Court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  Baloch, 550 F.3d at 1201 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)).  By adhering to these standards, the Court thereby "ensure[s] that [employment-discrimination law] does not become a general civility code" that involves courts in policing "the ordinary tribulations of the workplace."  Faragher, 524 U.S. at 788 (citations and internal quotation marks omitted).  While a

plaintiff need not prove a hostile work environment at this stage, he still must produce facts sufficient to allow a jury to find "extreme" conduct that satisfies the "demanding" standard for such a claim. Id.

Leach has not met the high bar required. At most, he points to "work-related actions by supervisors" that "courts typically do not find . . . to be sufficient for a hostile work environment claim." Munro v. LaHood, 839 F. Supp. 2d 354, 366 (D.D.C. 2012) (citation omitted); see also Bell v. Gonzales, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) ("Occasional instances of less favorable treatment involving ordinary daily workplace decisions are not sufficient to establish a hostile work environment."). These actions do not rise to the level of conduct that is "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Harris, 510 U.S. at 21 (citation omitted); see, e.g., Nurriddin v. Bolden, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (dismissing hostile-work-environment claim where allegations of "disparaging remarks, criticisms of [plaintiff's] work, and other negative comments d[id] not sufficiently demonstrate a significant level of offensiveness"); id. ("Nor can the removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management be characterized as sufficiently intimidating or offensive in an ordinary workplace context.") (citations omitted). Finally, Leach offers only conclusory allegations that these actions had anything to do with his membership in a protected class or his EEO complaints. The Court will thus grant Defendant's Motion with respect to Leach's remaining counts as well.

\*   \*   \*

The through-line beneath Leach's arguments is that there were positive attributes to his performance and that it was not his fault that others found him to be a difficult colleague. But the Court lacks authority to "second-guess an employer's personnel decision absent

demonstrably discriminatory motive." <u>Waterhouse v. D.C.</u>, 298 F.3d 989, 995 (D.C. Cir. 2002) (quoting <u>Fischbach</u>, 86 F.3d at 1182).  Plaintiff has offered no grounds for a rational juror to conclude that the reason he was investigated, suspended, and passed over for promotion was racial discrimination or retaliation, rather than a years-long string of workplace-conduct issues. Summary judgment is thus the proper end to this tale.

## IV.     Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment.  A separate Order so stating will issue this day.

<u>/s/ *James E. Boasberg*</u>
JAMES E. BOASBERG
United States District Judge

Date:  <u>March 14, 2023</u>